IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED ___ ENTERED
___ LOGGED ___ RECEIVED

AUG **1 4** 2018

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY _____ DEPUTY

EULISTA DUNN,     *

Plaintiff     *

v.     *     Civil Action No. PJM-17-1990

FRANK BISHOP, *et al.*     *

Defendants     *

       ***

## MEMORANDUM OPINION

In response to this civil rights complaint, Defendants Warden Frank Bishop, CO II Jamey L. Durst, CO II Dustin L. Gursky, and CO II Dean W. Rounds, Correctional Officers at the North Branch Correctional Institution (NBCI) filed a Motion to Dismiss or in the alternative for Summary Judgment. ECF 13. Plaintiff filed a response in opposition to the motion.[1] ECF 18. The Court finds no need for a hearing. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, Defendants' motion, construed as a Motion for Summary Judgment, shall be GRANTED.

## I. BACKGROUND

### A. Plaintiff's Claims

Plaintiff Eulista B. Dunn, an inmate committed to the custody of the Maryland Department of Public Safety and Correctional Services (DPSCS) and currently confined in the

---

[1] Plaintiff has also filed a "Motion to Compel" (ECF 21) wherein he complains about the manner in which the partial filing fees have been collected in this case and seeks an Order directing the Finance Officer at his place of incarceration cease collecting fees from gifts he receives and collect the filing fees only from his "income." The Motion will be denied. If Plaintiff believes his civil rights are violated in the manner the fees are collected, he is free to file a new civil rights case setting forth those allegations.

North Branch Correctional Institution, (ECF 5 at p. 2)[2] alleges that while he was incarcerated at NBCI, Defendants denied him access to mental health care.

Specifically, Plaintiff alleges he has been diagnosed with mental health issues since he was a child. ECF 5 at p. 4. Plaintiff states that he was placed on disciplinary segregation in 2009 and remained there on January 5, 2015, when during the night he began to hear his deceased father's voice in his head but it sounded as though it was in his cell. *Id.* Plaintiff indicates that prior to hearing the voice he had been thinking, visualizing, and planning ways to commit suicide. *Id.* Leading into the morning of January 6, 2016, his father's voice began to tell him that it was time for him to come join him. *Id.* Plaintiff claims that he dealt with the hallucinations for over a week and that on three different occasions his neighbor called over to ask who he was talking to. ECF 5 at p. 8.

Plaintiff was scheduled to see the psychologist on January 6, 2016. Sergeant Puffenberger escorted Plaintiff to see Dr. Siracusano. ECF 5 at p. 5. Plaintiff explained to Dr. Siracusano that the medications he was taking were not effective to treat his mental health issues. *Id.* Plaintiff states that he was then asked to step out of the room because "staff wanted to have a word with him." *Id.* Plaintiff states that Defendant Rounds stepped into the room and lied to Dr. Siracusano telling him that Plaintiff was selling his psychiatric medication on the tier. *Id.* Plaintiff states that Rounds made the allegation without any evidence as he had never bene charged with a disciplinary infraction. *Id.* When Plaintiff stepped back into the room, Dr. Siracusano advised him that he was not going to re-assess Plaintiff's medication but that he would change the prescription to "crush and float" a procedure Plaintiff describes as smashing medication in a cup and then putting water on top to prevent the inmate from hoarding medication. *Id.* at p. 6.

---

[2] The original Complaint was not signed by Plaintiff. ECF 1. Plaintiff was provided an opportunity to cure the deficiency. ECF 4. Plaintiff's signed Amended Complaint and exhibits attached thereto (ECF 5) are identical to the original Complaint filed.

Plaintiff states that when he attempted to further advise Dr. Siracusano of the voices, Rounds grabbed him by his arm and dragged him out of the room and back to his cell. *Id.* at p. 6. Plaintiff states that during lunch, he refused to eat and held his feed up slot open in order to get medical attention. *Id.* Plaintiff explains that this is a method used in the disciplinary housing unit by inmates to get attention as if an inmate prevents the slot from closing all operations are to stop, a security "bubble" placed on the inmate's door, and a supervisor notified. *Id.* If the supervisor cannot convince the inmate to close the slot, an extraction team is assembled and the inmate forcibly removed from the cell. *Id.*

Sgt. Puffenberger came to Plaintiff's cell and he advised her that he needed to see psychology staff immediately. ECF 1 at p. 6. Puffenberger told Plaintiff that she would speak with "J. Simmon." When Puffenberger returned, she told Plaintiff that he would be scheduled for an emergency re-evaluation on January 12, 2016 (which was later rescheduled for January 13, 2016). At this, Plaintiff agreed to shut his slot. *Id.* at p. 6.

Rounds appeared at Plaintiff's cell door on January 13, 2016, and told Plaintiff that Dr. Siracusano refused to see him and that if Plaintiff did not like the medication he was prescribed, Siracusano would remove him from all medication. ECF 5 at p. 7. Plaintiff told Rounds he was suicidal and needed to see psychology staff, but "Rounds smirked and walked away." *Id.* At 11:00 a.m. that day, Plaintiff sent a letter to psychology associate Beitzel advising her of the situation. *Id.*

The following morning Defendant Mallow came to Plaintiff's cell during count. ECF 5 at p. 7. Plaintiff advised Mallow that he was suicidal and needed to be placed on "observation/precautions." *Id.* During lunch, Plaintiff again held his feed up slot open in an

3

attempt to receive treatment. *Id.* Defendant Durst came to Plaintiff's door and attempted to bribe him by offering to change his cell assignment, if Plaintiff closed the slot, but Plaintiff refused.

Mallow returned to Plaintiff's door advising Plaintiff that he had mail from Beitzel but he would only give it to Plaintiff if agreed to close the slot. Plaintiff declined. ECF 5 at p. 7. Despite not being seen by psychology staff, Plaintiff allowed the slot to be closed at dinner time. ECF 5 at pp. 7-8. "[A]t that time, he decided to follow his father's advice and recommendation and swallowed about thirty (30) #20 Baclophin Muscle Relaxers with the sole intentions [sic] of committing suicide." ECF 5 at pp. 7-8.

### B. Defendants' Response

Defendants provide verified business records which include Plaintiff's medical records along with their declarations.

Frank Bishop, Warden of NBCI, avers that mental health and medical health services are provided to NBCI inmates by private health care contractors. ECF 13-3 at ¶ 2 (Bishop Decl.). Neither Bishop, nor any member of NBCI's staff have personal involvement in the provision of medical or psychiatric care to any NBCI inmate. *Id.* Nor do Bishop or any NBCI staff have the authority to make decisions concerning an inmate's medical or psychiatric care or the authority to order medical providers to perform any particular procedure or render any particular treatment. *Id.* Inmates' health appointment dates and times are set by the private contractors. An inmate can fill out a sick call slip to seek evaluation and treatment. The slips are collected and reviewed by the contractors and appointment dates and time are determined by the contractor after they review the sick call requests. ECF 13-3 at ¶ 3. In responding to complaints regarding the provision of health care, Bishop states that he and his staff rely on the reports, assessments and judgments of the health care contractors. ECF 13-3 at ¶ 4. Bishop denies interfering,

4

hindering or delaying Plaintiff's access to medical or mental health care or treatment and is unaware of any situation where a DPSCS/NBCI employee acted in such a manner. ECF 13-3 at ¶5. Bishop denies having any prior notice or indication that Plaintiff had any suicidal intent or ideation prior to his reported suicide attempt on January 14, 2016. ECF 13-3 at ¶ 6.

Officers Dean Rounds, Sr., Jamey Durst, Dustin Gursky, and Mallow each aver that they have no independent recollection of any conversation with Plaintiff in January of 2016 where he expressed he was suicidal. ECF 13-4 at ¶ 3 (Rounds Decl.); ECF 13-5 at ¶ 3 (Durst Decl.); ECF 13-6 at ¶ 3 (Gursky Decl.); ECF 13-10 (Mallow Decl.) Rounds, Durst, Gursky, and Mallow each aver that if Plaintiff had expressed suicidal ideation they would have reported the situation so that if warranted he could be placed under suicide precautions. *Id.* Rounds, Durst, Gursky, and Mallow each deny interfering with, hindering, or delaying medical or psychological treatment to Plaintiff. ECF 13-4 at ¶ 4; ECF 13-5 at ¶ 5; ECF 13-6 at ¶ 5; ECF 13-10 at ¶4. Rounds, Durst, Gursky, and Mallow further aver that they had no personal involvement in the provision of medical or psychological care to Plaintiff and had no authority to order health care staff to prescribe any particular medication or perform or render any particular procedure or treatment. ECF 13-4 at ¶ 5; ECF 13-5 at ¶ 6; ECF 13-6 at ¶ 6; ECF 13-10 at ¶ 5.

Durst and Gursky explain that Plaintiff had a history of holding open his food slot to disrupt the tier or to get attention. ECF 13-5 at ¶ 4; ECF 13-6 at ¶ 4. They explain that if they offered to move Plaintiff to another tier, it would have been done as an incentive for him to obey the rules and close his flood slot. ECF 13-5 at ¶ 4; ECF 13-6 at ¶ 4.

Lauren Beitzel, a Mental Health Professional Counselor at NBCI, started working the segregation tier that housed Plaintiff in August of 2015. ECF 13-8 at ¶¶ 1 & 3. Beitzel provided psychological services to Plaintiff during the months before, during, and after his reported

suicide attempt in January of 2016. *Id.* at ¶3. To her recollection, Beitzel denies that Plaintiff ever reported to her that he had any present suicidal ideation.[3] *Id.* at ¶ 4.

According to Beitzel, Plaintiff "has a history of acting out when he hears something he does not like or does not receive something for which he asks." ECF 13-8 at ¶ 5. As examples, Beitzel indicates that Plaintiff protests by holding open his food slot and refusing to be handcuffed for escort after group therapy sessions. *Id.*; *see also* ECF 13-9 at p. 18 (on 12/1/15 Plaintiff held feed slot, was disruptive on the tier, and not escorted to group therapy); p. 55 (on 1/12/16 Plaintiff refused to be handcuffed after group therapy).

Beitzel indicates that she spoke with Plaintiff on January 6, 2016, before his appointment with Dr. Siracusano. ECF 13-8 at ¶ 6. Based on her knowledge of Plaintiff, Beitzel advised Plaintiff "that he should refrain from selling or giving his medications to other inmates, from hoarding his medications, and from losing his composure when he hears information that he does not like, particularly in anticipation that Dr. Siracusano might not grant Mr. Dunn's request for medication changes." ECF 13-8 at ¶ 6; *see also* ECF 13-9 at p. 39 (Onsite Consult note dated 1/8/16). Beitzel avers that Plaintiff did not express any suicidal ideation or appear to be in distress. ECF 13-8 at ¶ 6. Beitzel affirms that the medical records attached to her declaration (ECF 13-8 at p. 3) accurately reflect the substance and conclusions about her discussions with Plaintiff on January 6, 2016. *Id.* at ¶ 7.

Dr. Vincent Siracusano is a psychiatrist employed by Mental Health Management, Inc., who provides psychiatric care to inmates housed at NBCI. ECF 13-7 at ¶ 1 (Siracusano Decl.) Siracusano sees patients on a periodic basis. *Id.* at ¶ 3. Those visits are noted in the patient's

---

[3] Consultation notes from January 12, 2016, prepared by Beitzel indicate that Plaintiff reported his medication was not working and that he was more anxious and depressed which "historically caused him to lash out in various ways, including being suicidal and/or homicidal." ECF 13-9 at p. 55. Beitzel reviewed the need for respect and composure and the need to find productive activities. *Id.* Plaintiff denied suicidal or homicidal thoughts. *Id.* Beitzel advised Plaintiff that his medication concerns would be referred again to psychiatry. *Id.*

record as "psych follow up" visits. *Id.* Siracusano explains that if an inmate feels the need to be seen sooner than their regularly scheduled follow up visit, they may submit a sick call slip. *Id.* at ¶ 4; *see also* ECF 13-8 at ¶ 10 (Beitzel Decl). When an inmate is seen in response to a sick call slip or on an urgent or emergency basis, it is reflected in the medical notes. ECF 13-7 at ¶ 5; ECF 13-8 at ¶ 10.

Siracusano saw Plaintiff on January 6, 2016, for a regularly scheduled follow up. ECF 13-7 at ¶ 6; *see also* ECF 13-9 at pp. 25-34 (1/6/2016 Medication Management note). Plaintiff did not express any suicidal ideation at that time, nor did he express any urgent conditions or concerns. *Id.* Siracusano further avers that Plaintiff's medical records indicated a recent past history of giving or selling drugs to other inmates, hoarding drugs, and possessing drugs that were not prescribed to him.[4] *Id.* at ¶ 8. Accordingly, Siracusano ordered that Plaintiff's medications be administered on a crush and float basis in order to prevent his abuse of medications. *Id.* at ¶ 9. Siracusano avers that "[n]o correctional officer interfered with my decision concerning the psychiatric treatment of [Plaintiff.]" (*id.* at ¶ 10) and that his decision to continue Plaintiff on his then prescribed medication was solely made on the basis of sound psychiatric medicine. *Id.* at ¶ 7.

---

[4] On November 5, 2015, a chart update was entered indicating that Plaintiff was found with multiple pills in his cell and was attempting to pass them to another inmate. ECF 13-9 at p. 2. It was noted that he possessed two different doses of Neurontin, as well as Vistaril, and Elavil for which he did not have a current prescription order. *Id.* Blood work to check Plaintiff's drug levels was ordered and it was noted that if he was sub-therapeutic, his medication would be discontinued. *Id.* The following day, a new chart update was entered noting that Plaintiff had been caught passing medication and held an abundance of medication in his cell. It was requested that the pharmacy make the medication available in liquid form to improve compliance and decrease misuse. *Id* at p. 9. The request was denied with a notation that the medication be administered as crush and float and that staff have Plaintiff open his mouth and move tongue side to side to ensure medication compliance. *Id.* at pp. 3, 7-8, 14, 16.

After his meeting with Siracusano, Plaintiff engaged in a hunger strike[5] which Beitzel explains was a protest against Siracusano's ordering his medication to be provided as crush and float to prevent his hoarding or sharing the medication. ECF 13-8 at ¶ 7; ECF 13-8 at p. 3; ECF 13-9 at pp. 35. 37, 39. Beitzel also explains based on her training and experience, familiarity with Plaintiff, and the statements he made in the complaint, that to a reasonable degree of certainty in the field of psychology, Plaintiff's holding of his food slot on January 13 and 14, 2016, was not for seeking precautions against suicide but in order to create a disruption in protest of Siracusano's ordering his medication be provided on a crush and float basis. ECF 13-8 at ¶ 8.

Beitzel also indicates that she received a letter from Plaintiff on January 13, 2016, complaining about Siracusano and some of his property. ECF 13-8, ¶ 9; ECF 13-8 at p. 4 (Plaintiff's 1/13/16 letter to Beitzel). Beitzel avers that in her opinion, based on her experience with Plaintiff, if he was having any suicidal ideation or felt the need for urgent psychological care, he would have stated that in that letter. ECF 13-8 at ¶ 9.

On January 14, 2016, Plaintiff was found unresponsive in his cell. ECF 13-9 at p. 58. He had written a suicide note and took an overdose of pills. *Id.* He was transported to the hospital for further treatment. *Id.* at p. 59. Approximately 40 minutes after arriving at the hospital, Plaintiff was described as laughing and joking with staff. ECF 13-9 at p. 61-63. Toxicology reports found no detectable levels of medication likely to produce an overdose. *Id.* at p. 63. He was returned to the prison the same day.

---

[5] Plaintiff was seen by medical and mental health care providers on January 5, 6, 7, 8, 9, 2016 (ECF 13-9 at pp. 23, 25, 35, 37, 39, 45.) His hunger strike began after his meeting with Siracusano on the 6th and was over by January 11. ECF 13-9 at p. 45. He refused to be seen in the medical clinic on January 12, 2016 (ECF 13-9 at pp. 50-51) but attended his group therapy session where at the conclusion he refused to be handcuffed in order to be escorted from the meeting. *Id.* at pp. 52, 55. Beitzel corresponded with Plaintiff on January 13, 2016. ECF 13-8, ¶ 9;

Beitzel states that on January 15, 2016, when Plaintiff returned from the hospital, he was placed on suicide precautions. ECF 13-8 at ¶ 11; *see also* ECF 13-9 at p. 71. He informed her he took an overdose the day before. *Id.* He advised Beitzel that he had advised unidentified custody staff of his suicidal thoughts the morning of his suicide attempt but no one did anything. ECF 13-9 at p. 71. Beitzel reviewed the daily logs of suicide behavior dating back to August of 2015 when she was assigned to the segregation unit. ECF 13-8 at ¶ 11. The only reported suicide precaution or event involving Plaintiff was for the reported overdose on January 14, 2016. *Id.* Plaintiff advised Beitzel that he did not want to die and based on that statement as well as others she determined that suicide precautions were no longer necessary. *Id.*

## II.     STANDARD OF REVIEW

Defendants' Motion is styled as a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) or, in the Alternative, for Summary Judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are

deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Because matters outside the pleadings are presented in the Defendants' dispositive motion, it is considered a motion for summary judgment. Fed. R. Civ. P. 12(d).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322-23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a

verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

Because Plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the Court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat v. Balt. Ravens Football Club*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex*, 477 U.S. at 323-24.

## III. ANALYSIS

### A. Failure to Exhaust

Defendants raise the affirmative defense that plaintiff has failed to exhaust his administrative remedies. If plaintiff's claims have not been properly presented through the administrative remedy procedure they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534

U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004).[6]

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The doctrine governing exhaustion of administrative remedies has been well established through administrative law jurisprudence and provides that a plaintiff is not entitled to judicial relief until the prescribed administrative remedies have been exhausted. *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) (citations omitted). A claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S.Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

---

[6] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Corr. Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," Md. Code Ann. Corr. Servs. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process so that the agency reaches a decision on the merits. *Chase*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement so that the agency addresses the merits of the claim, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in

13

accordance with the applicable procedural rules, including deadlines." *Woodford*, 548 U.S. at 88, 93. This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 93 (quoting *Pozo*, 286 F.3d at 1024 (emphasis in original). But, the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials.". *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, 136 S.Ct. 1850 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id.* at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

The Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

The DPSCS has an established "administrative remedy procedure" ("ARP") for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann. (2008 Repl. Vol.), Corr. Servs. ("C.S."), §§ 10-201 *et seq.*; Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8). An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; OPS.185.0002.02.[7]

---

[7] OPS.185.0002 is an Executive Directive created by the Maryland Department of Public Safety and Correctional Services, titled "Administrative Remedy Procedure (ARP)" ("ARP Directive") available for review at

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any DOC official or employee. C.S. § 10-206(b). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process, before filing a grievance with the IGO. *See* C.S. § 10-206(b); *see also* OPS.185.0002.02. There is an established administrative remedy procedure process that applies to all Maryland prisons. OPS.185.0002.02. Therefore, when the ARP process provides a possible remedy, it must be followed and completed before an inmate may file a grievance with the IGO.

The ARP process consists of multiple steps. For the first step, a prisoner is required to file his initial ARP with his facility's "managing official" OPS.185.0002.05C(1), which is defined by C.S. § 1-101(k) "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility." In the DPSCS, each facility's warden is responsible for the ARP at the institutional level. OPS.185.0002.05E. Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. OPS.185.0002.05J.

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP. The prisoner has 30 days to file an appeal with the DPSCS's Deputy Secretary for Operations or that official's designee. OPS.185.0002.05L. For prisoners in DOC facilities, the Commissioner of Correction is the official to whom this appeal is sent. *Id.*

---

http://itcd.dpscs.state.md.us/PIA. "[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *see also* Fed. R. Evid. 201(b)(2) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO. OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B. When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208(2)(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. *See* C.S. § 10-208; COMAR 12.07.01.07D; *see also* Md. Code Ann., State Gov't §§ 10-101 et seq.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. C.S. § 10-209(b)(1)(i) & (ii); COMAR 12.07.01.10A. However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)(2), (c).

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. An inmate need not, however, seek judicial review in State court in order to satisfy the PLRA's administrative

exhaustion requirement. *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

It is undisputed that while Plaintiff instituted the grievance process, he did not complete the process in that he failed to file a grievance regarding his claim to the IGO. ECF 13-12 (Neverdon Decl.) As such, his claim is subject to dismissal.

## B. Personal Participation

Even if Plaintiff had exhausted his administrative remedies, his claim would nevertheless fail. Section 1983 provides for liability of "[e]very person who, under color of [state law], *subjects, or causes to be subjected*, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added)). "Although § 1983 must be read against the background of tort liability that makes a man responsible for the natural consequences of his actions, liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiffs' rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (citation, alteration, and internal quotation marks omitted). There is no evidence that Defendant Bishop was involved in the incident.

Quite simply, it is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

18

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). That sort of evidence has not been presented in this case regarding Bishop.

## C.    Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison

staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The Fourth Circuit has identified two slightly different aspects of a correctional official's state of mind that must be shown in order to satisfy the subjective component in the context of medical care. First, actual knowledge of the risk of harm to the inmate is required. *Young v. Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("It is not enough that the officer should have recognized it."). Beyond

such knowledge, however, the officer must also have "recognized that his actions were insufficient" to mitigate the risk of harm to the inmate arising from his medical needs. *Parrish*, 372 F.3d at 303 (emphasis added); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id.* The *Bowring* Court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id.* at 48.

It is clear from the objective evidence, established through verified medical and mental health records as well as declarations under oath, that Plaintiff received constitutionally adequate care and that the named Defendants did not interfere with the provision of same. Dr. Siracusano avers that he did not change Plaintiff's medication to "crush and float" due to any reports by correctional staff but based on records in Plaintiff's file that he had been abusing his medication. Apparently unhappy with that decision, Plaintiff engaged in a course of conduct to manipulate staff including: repeatedly holding his feed-slot, refusing to be handcuffed, engaging in a hunger strike, and the suicide attempt.

Additionally, there is no evidence that Plaintiff suffered any harm as a result of the conduct complained of. The record evidence demonstrates that within the hour of being transported to the hospital, he was joking with staff, no objective evidence in the toxicology

report was found to support Plaintiff's self-report of a suicide attempt, Plaintiff was returned to the institution that day, and removed from suicide prevention protocols the following day.

Moreover, there is simply no evidence that any of the named Defendants interfered in the care needed or knew of additional care that was required and somehow refused to make it available. They each dispute Plaintiff's unverified assertion that he notified them he was suffering from suicidal thoughts.

Plaintiff was regularly seen by medical and mental health providers in the days leading up to his suicide attempt, none of whom noted that he had expressed suicidal thoughts. Additionally, Plaintiff corresponded with Beitzel the day before his suicide attempt and did not indicate he was feeling suicidal or seek any other emergency treatment. It is noteworthy that Plaintiff alleges that Rounds failed to take any action regarding his request for psychological care, however, in the letter to Beitzel, Plaintiff simply complained of his medication order and property that he wished to have restored. He made no reference to Rounds or any other staff. Nor did he mention any suicidal concerns. Beitzel avers that in her professional opinion, had Plaintiff been having suicidal ideation on January 13, 2016, he would have reported that to her in the letter. Additionally, Plaintiff did not submit any sick call slips during this time seeking additional treatment. Plaintiff has failed to come forward with any evidence that Defendants were deliberately indifferent to his serious medical needs. Thus, they are entitled to summary judgment.

## IV.    CONCLUSION

Defendants have established that they are entitled to judgment in their favor and their Motion for Summary Judgment shall be granted. A separate Order follows.

/s/

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

August 14, 2018